Oh yay, oh yay, oh yay. The Honorable Appellate Court, 5th District, State of Illinois is now in session. The Honorable Justice Bowie presiding along with Justice Cates and Justice Barberis. The first case this morning is 5-210391, Solomon, et cetera, et al. versus Center for Comprehensive Services, Inc. et al. Arguing for the appellant, Teresa Solomon, as guardian of the estate of Megan Farmer, a disabled person, and Julia Farmer, a minor, is Christopher Quido. Got three appellees who have agreed to split their time, seven, five, and three. The first will be Jerry Connolly, arguing for the appellee, Center for Comprehensive Services, Inc. The second will be Attorney Timothy Sansone, arguing for the appellee's Albert Fosnack. And the third will be Attorney Jared Montgomery, arguing for the appellee's Dr. Douglas Strobel and Josephson Wallach-Munchauer Neurology PC. Each side will have 15 minutes for their argument. The appellant will also have five minutes for rebuttal. And as I indicated, the appellees have agreed to split their time, seven, five, and three. Please note only the clerk is permitted to record these proceedings. Good morning, counsel. Good morning. Good morning, Judge. Just a couple of things before we get started. I know we have some non-video participants. I think I see that most are muted. Ms. Carlson, okay, she's gone muted. I just ask that stay muted. That way, we keep any background noise to a minimum so we can all hear okay. I will do my best to kind of keep time on the appellee's arguments, but I'm gonna also lean on you, gentlemen, to do so on your own time, the seven, five, and three. With all that being said, Mr. Cueto, are you ready to proceed? I am, Justice Bui. Thank you. Then go right ahead. May it please the court, opposing counsel, my name is Christopher Cueto, and I represent Megan and Julia Farmer in this case. I'm here to ask this court to reverse the dissumary judgment dismissal of Megan and Julia Farmer's claims against NeuroRestorative and their agents, Dr. Faznak, who was the medical director of NeuroRestorative at the time that Megan Farmer was an inpatient there, further ask the court, excuse me, and further ask this court to reverse the trial court's dismissal of Dr. Strobel because his contacts with the state of Illinois with respect to his care and treatment of Megan subject Dr. Strobel to the jurisdiction of Illinois courts. I really wanna start out with Julia's claims because I believe the trial court, again, Megan Farmer was a young lady who had a lot of cognitive problems, brain injuries. She was an inpatient at NeuroRestorative. NeuroRestorative is located in Carbondale, and it is an inpatient facility for people with brain injuries. Megan went there in approximately October, 2011. Julia Farmer is her daughter, her daughter that was born with spina bifida, which is one of the most disabling birth defects that any human being can suffer. And I really, again, wanna start out with Julia's claims because I believe the trial court committed error when the trial court applied the so-called transferred negligence doctrine to Julia's claim when she ruled that Megan did not have a viable negligence claim. She simply dismissed Julia's claim as well. I believe that's error. I'm gonna get to the reason why Megan had a viable negligence claim as well, or at least there's enough evidence to overcome summary judgment. The standards on summary judgment are familiar to all of us. The right to relief must be free from doubt. All adverse inferences, all the indications from anything are to be light, be construed in the light most favorable to the plaintiff. But even before we get to Megan's claim, Julia's claim, the whole notion of transfer negligence, it arose in a case called Renslow. It remains the leading case. Renslow involved a young woman who had a blood transfusion. The transfusion that she received, she received RH negative blood and she needed RH positive blood. This mistake occurred several years prior to her child's conception. The child then was born with birth defects and the child brought suit and the Supreme Court found, quote, there is a right to be born free from prenatal injuries foreseeably caused by a breach of duty to the child's mother. So the whole focus of a transfer negligence claim when you're representing someone, a child who has claimed an in-utero injury is on the special relationship and whether the injury the child sustained is foreseeable. That's right out of Renslow. Again, the Supreme Court noted, quote, as medical science progressed, the courts took notice that a fetus is a separate human entity prior to birth. It is by now commonly accepted that at conception, the egg and sperm unite to jointly provide the genetic material requisite for human life. Thus, various courts have gradually come to recognize that the embryo from the moment of conception, and now here's this very important, is a separate organism that can be compensated for negligently inflicted prenatal harm. So again, the focus is on the special relationship. I don't think any of us can dispute that the relationship between a pregnant woman and the developing fetus is unlike any other condition that we know about, frankly. And really the whole special relationship has been pretty much confined, frankly, to in-utero injuries in this context. We could talk about the other cases, Kirk, all these other cases that we cite, I'm happy to discuss, but there's never been a single case that I was aware of, or that the defendants have cited, in which a child claiming an in-utero injury has been denied the special relationship test and whether to go. And it doesn't claim, it doesn't depend upon whether the mother has a viable negligence claim. So if the focus is on the special relationship, obviously we have Julia was Megan's child. And Megan went to NeuroRestorative taking a drug called- Mr. Quito, before you move on, let me ask you a question. Didn't the court actually find that there is a claim for Julia, but it was foreclosed because there was no negligence as to Megan? The court did find that, Justice Gates. I believe that's in error. Sorry? I believe that is in error, yes. Okay, so there's no doubt that the court acknowledged that there's an in-utero claim. Well, yes, and then she extinguished it in a sentence after discussing the whole waiver issue, which I do intend to get to. Okay. I appreciate the question, frankly, because I want to stress that Julia's claim is not dependent upon Megan's claim. It exists separate and apart from its own. You know, in a lot of these cases that involve birth injuries, the mother isn't even named as a party. And when the Supreme Court said that the developing embryo is a separate organism that can be compensated for negligently inflicted prenatal harm, then I believe that there's no requirement that the mother maintain a viable claim. I believe Megan does have a viable claim here, but- Well, and I know you're going to argue that, but doesn't Renslow say that it's foreseeably caused to the mother? Well, no, I don't believe so. The injury is, the foreseeability of the injury is to the child. Now, there has to be a negligent to the mother. We've alleged negligence here in the failure to warn. Depakote is such a dangerous drug. You know, the word teratogenic just simply means the propensity to cause birth defects. And the foreseeability focus is on the injury to the child. And that's especially true when you look at like Renslow itself, where the child was injured because the mother received this incompatible blood. And it only occurred years later. Renslow, the woman who received the incompatible blood, I believe she was a young, I only know she was a teenager yet. And the court said it was foreseeable, however, that she would later grow up, that she would marry, and that she would have a child and that a child could... So the foreseeability that Renslow focused upon, even in Renslow, was the child's injury caused by this incompatible blood transfusion. And remember, at the time that that was done, this child hadn't even been conceived yet.  The negligence in Renslow went to the mother. She got the wrong kind of blood. Well, that's true, that's true. But the foreseeability focus was on the child's injury and that it was foreseeable that consequence. And here too, look, even I don't wanna get too far on the waiver because that's down the road, but there is a cause of action for Megan here on informed consent, especially when I get into the warnings on Depakote. Even if the court accepts this waiver, our argument, and there's a plenty of factual questions about that, why it shouldn't be accepted. The cause of action for Megan, a waiver is an affirmative defense. The duty to Megan exists prior to that affirmative defense. The affirmative defense may wipe it out. I don't think it does so here, but that duty still exists. And the foreseeability here has to do with the dangers of Valproate and its teratogenic effect. Again, teratogenic just means the propensity to cause birth defects. Depakote, the drug contains a black box warning. That's the strongest warning that the FDA knows how to give. It is literally a black box in the middle of the PDR warning with emboldened language. And here's what doctors and prescribers are told from the FDA and the manufacturer of the drug. I believe they have it labs. And by the way, Depakote and Valproate acid are frequently used interchangeably. Valproate acid is the chief ingredient, if you will, of Depakote. And so the warning states, Valproate can cause major congenital malformations, including neural tube defects, e.g. spina bifida. Prescribers, this is right out of the warning again. Prescribers should inform pregnant women and women of childbearing potential. Women of childbearing potential. That's Megan when she was a neural restorer. That use of Depakote during pregnancy increases the risk of birth defects and adverse effects on neural behavior development. So the foreseeability of a child being born with spina bifida is right in the warning. And then we get into what the cause of action against Dr. Strobel's and Dr. Fasnacht implied. Neither one of these doctors advised Megan, a woman of childbearing potential, about the birth defect risks associated with the drug that they prescribed. Dr. Strobel knew that Megan was on no form of birth control, and he admitted that he failed to discuss the spina bifida risk with Megan. And because he, quote, didn't want to poison the water, close quotes. He was concerned that if she were fully informed about the birth defect risk associated with Depakote, the patient might say, and this is right out of the deposition, quote, well, wait a minute, I'm not going to take that. He also again testified that he was Megan's doctor while she was an inpatient and neuro restorative. Dr. Fasnacht did not, did not advise Megan of the teratogenic effects of the drug that he prescribed. He claims that he was just fulfilling the script from the neurologist from Indiana. But I think that's a, that's a classic factual question that precludes summary judgment. You can't summary judgment him out on that issue. But he clearly said that he did not, he did not warn Megan of the teratogenic effects there. You know, the nurses at neuro restorative, Megan was approximately 25. I think during this time, she was born in 1986. She was in neuro restorative from essentially October, 2011 to April, 2012. When she started showing an interest in men, frankly, the neuro restorative nurses did not report that to either Dr. Strobel or to Dr. Fasnacht. Dr. Fasnacht testified he'd have liked to have known that because he knew what, just how teratogenic this drug was. So that, that, all of those form a basis for Megan's claim. Again, I don't think she has to be, she's not an indispensable party. The way the defendants are arguing this is if the mother is not present, then there is no claim. I mean, that's just not the law. Because again, she's a separate organism that, that is determining, is deserving of protection. And Illinois provides that protection. You're talking about Julia now again? Yes, ma'am. Yes. Excuse me, Justice Cates. I am. Yes. I'm talking about Julia. The Julius claim survives even if Megan's claim does not, even if Megan doesn't bring suit, her claim survives. The foreseeability of the injury that she suffered is just manifest. You know, there are two cornerstones, frankly, or at least among the cornerstones of Illinois law. One, fetal life is protected. Rensselaer makes that clear. The case that makes that most clear is the case out of the Northern District that we cite. But it's been a longstanding policy of Illinois law that fetal life is to be protected. And where foreseeable harm, the other second injury I want to, cornerstone I want to touch on is where foreseeable harm occurs, the injury, the injured are deserving of compensation. Again, Rensselaer, the law is presumed a furnish a remedy for the readjust of every law. So, I mean, where does that leave Julia then with the court's ruling? Well, what did she ever do? You know, spina bifida occurs to in the first trimester, typically of pregnancy. What did she do that would foreclose her claim when she has, you know, is born with a spina bifida? It's it occurs typically again in the first trimester of pregnancy, frequently before the woman even knows she's pregnant before she's missed a period. It's a horrible condition. The spinal cord is not fully invalid or is not fully protected. And so all of these nerves in the spinal cord are exposed. Julia had surgeries almost from the minute that she was born. She's had multiple surgeries. She's been confined to a wheelchair. She has significant cognitive issues. She never signed a waiver of liability. So where is it that she can be just denied her claim because of something her cognitively impaired mother did or did not say? And if you look at, you know, it struck me as we were going through this, frankly, the only cases which are, which I believe the special relationship doctrine has been allowed because it isn't sued by a nonpatient. And it just is the cases. I'll acknowledge that Julia was not either one of these doctors patient at the time. She wasn't even conceived yet the time that they're prescribing Pepico. The only places that what they've really been in while is where there has been a prenatal in utero injury. And frankly, all the cases which denied the special relationship, a passenger in a car, an adult, a child in a therapy situation. Those cases were all denied and they did not involve this in utero injury. So I believe that the court aired in and simply striking and there's very little analysis of that. The court, you're right. The court did acknowledge that. It went through a pages of the waiver analysis and then said, you know, Megan's claim doesn't survive. The exculpatory clause she did. And then there's just a sentence. So because she doesn't have a claim, Julia's claim is dismissed as well. Mr. Quito, let me ask you a question if I could. Totally different topic now. Because I see your time is out and I want to ask this question before the other gentlemen get to speak. Where in the record would I find the question of fact related to Megan's ability to understand the waiver? Is there an expert witness? Is there a Dr. Fasnacht? Who's going to talk about her cognitive ability to understand the waiver? There was no, Justice Cates, there was no expert that opined upon that. In 2006, Dr. Strobel, authored a letter. We cite this in our brief in which he said that she was incapable of making her own decisions. I'm trying to look. Oh, here it is. In 2006, and we cite in our brief, Dr. Strobel said that Megan lacked decisional capacity. Additionally, and when she checked in in 2011 at NeuroRestorative, the nurse noted that she thought that she was in Lexington, Louisiana. And the nurse admitted that that shows a degree of cognitive impairment. So the trial court's order cites a statute saying that there must be expert testimony that an individual is in need of a guardianship. Do you think that the guardianship issue is the same as whether or not somebody can cognitively understand a waiver? I do, Judge. The guardianship issue, you know, the waivers are disfavored. They're disfavored and they're strictly construed against their findings against the drafters. And so there's no, when you read the cases on exculpatory clauses, there's no requirement that a guardian, there's numerous factual questions existing to the waiver, but the guardian, she doesn't have to have her own guardian in order for that to be done. These are factual questions that can be presented to the jury about the waiver. I know I'm out of time here. I don't want to eat into my rebuttal. And so I would just refer the court to the briefs on that issue, as well as, you know, Dr. Strobel signed two medical, on a jurisdictional issue, signed two medical letters of necessity that she come here. He testified that he was still her doctor while she was there. So I just did a jurisdictional question real quickly. Let me assure you, you're not eating into your rebuttal because we'll give the other people, we'll give the other people additional time. I'm sure Justice Bowie will. But it sounds to me like you're answering the question differently than I asked it. So what you're saying is there are questions of fact regarding the waiver that are different than what might occur in a courtroom regarding guardianship. There are different levels of inquiry. I am, Justice Case. Okay. All right. Thank you very much. Thank you. Thank you, Justice Bowie. No, go right ahead. And to follow up, because, just because someone has a mental health issue or a cognitive disability doesn't necessarily make them, quote unquote, incompetent. There has to be a finding by a circuit court declaring someone incompetent and entering a guardianship, correct? For the guardianship, that's correct, Justice Bowie. So I believe the factual questions, though, and there are factual questions regarding the waiver beyond the capacity issue. But that's correct, I believe, yes. Okay. Obviously, Mr. Guido, you'll have your rebuttal time. There's a lot going on in this case. So I will, you know, we'll play a little fast and loose with the time just to make sure we are, you know, we get what we need today. Justice Cates or Justice Barberos, before we move on to Mr. Connolly, do you have any other questions? No, thank you. Okay. Mr. Connolly, go right ahead. You're on mute. May it please the court. My name is Jeremiah Connolly. I represent the Center for Comprehensive Services, NeuroRestorative Illinois and their employees. With regard to, I'll first address the transfer of negligence issue. With regard to that issue, on September 10th, 2018, the trial court level, by way of motions, dismissed Megan Farmer's medical negligence claims. There was no attempt to refile. There was no appeal. And therefore, as a matter of law, Megan had no viable, legally recognized medical negligence claim as of September 10th, 2018. What's happening here is Julia, her daughter, is attempting to, or has attempted to, resurrect Megan's dismissed negligence claims on the theory of transferred negligence. But transferred negligence by its own terms suggests that if you're going to transfer something, it first has to exist, in this case, with the mother. You can't transfer something if it doesn't first exist. In this case, the wrongful or negligent acts that were alleged, all occurred in relation to the multiple counts that were brought under the medical negligence claims, and which were all dismissed as not being legally viable in 1998. And so what we have- 1998? I'm sorry. In 2018, excuse me. Thank you, Justice. I apologize. With regard to what Julia and the appellant is trying to do here, is she's trying to create, or ask the court to create, new law recognizing an independent cause of action by a child where the mother, in this case, has no legally determined and legally viable medical malpractice claim. That has not been recognized, and for good reason. And counsel, it was interesting. He cited a quote from Renslow. I'll represent a couple of the quotes. One on page 356, the court in Renslow, which recognized transferred negligence, commented, plaintiff asked us to re-examine our notions of duty and to find, in essence, a contingent prospective duty to a child not yet conceived, but foreseeably harmed by the breach of duty to the child's mother. And as counsel cited, and I'll repeat what he cited, I agree with this statement. The court in Renslow said, we believe that there is a right to be born free from prenatal injuries foreseeably caused by the breach of duty to the child's mother. And so the Supreme Court was quite clear in delineating, in our opinion, that it's essentially a condition precedent to any notion of transferred negligence that there first be a duty and a breach of duty in relation to the child's mother. That was the entire context by which Renslow was decided. The Kirk case came along 10 years later and the Supreme Court had another opportunity to discuss this issue. And in the Kirk case on page 528, and I'll quote it, the court says, the duty in Renslow was based primarily on the injuries being a direct result of the alleged negligence to the infant's mother. So again, the Supreme Court in discussing the notion of transferred negligence addresses the issue in the context of first, foremost, and primary, it's all about the alleged negligence and the mother's cause of action for breach of duty to the mother. Therefore, Mr. Conley, are you saying that the court doesn't have jurisdiction to decide the negligence issues around Megan? Oh, that is our position that that was not appealed. That's over. In terms of the medical negligence claims. Correct. Okay. So why did the court trial court spend so much time on those claims? I can't honestly answer that other than it was our perspective that the court was reviewing it in the context of what would be transferred. Was there a duty and what would be transferred if Julia had a claim? But I can't answer that otherwise. So all of the motions for summary judgment that are mentioned by the trial court, those went to Julia's claims because that's not how I read them. No, I'm sorry, Justice. It also went to Megan's claims for general liability. So Megan had general liability claims saying she wasn't supervised, etc. And those negligence claims we addressed by way of both. The court discussed what was done, what was done by neuro restorative and others. But those were general negligence claims. In terms of the medical malpractice claims, it's our position that those were dismissed and that there is no difference. What's the difference between a general negligence claim and a medical malpractice claim? Well, the medical malpractice claim, as we understand it, relates to allegations of doctors, medical personnel, nurses prescribing or otherwise providing Megan with Depakote. And according to the plaintiff, the appellant, not providing her with adequate information about that or direction. The general negligence claim, as we understand it, relates to your facility, meaning my client's facility did not properly supervise her to make sure she didn't engage in sexual activity with another person, whether it be a person from a neuro restorative or from somewhere else. That's the general negligence claim. And that's all that really remains for Megan. For Julia, she's trying to resurrect the medical malpractice claims, which by our view, by Renslow, Kirk, and in particular Doe, if you look at Doe versus McKay, that was particularly helpful 10 years beyond Kirk in providing that the father can't bring a claim if the daughter didn't bring a claim. You don't even get to special relationship because the father doesn't have a right to bring a claim where the daughter didn't bring a claim. But it's even broader than that and more helpful than that. From a public policy standpoint, the Supreme Court in Doe took it a step further and said, look, if the doctor has to worry when he's prescribing Depakote, which is this helpful medication for Megan, and she even describes it really helped her. Her mother said that it helped her. If the doctor has to consider some theoretical situation where there is a pregnancy and she doesn't listen to direction and a child is born, now the doctor has to think in the Doe case. They said the doctor would be conflicted in prescribing, in deciding whether to prescribe Depakote for Megan, which she needs, and it was helpful to her, by some potential lawsuit or injury down the road to someone else, a third party, if this court were to determine that that third party would have an independent claim in the situation where the mother has no claim. And so Doe basically said, you would open up a can of worms. You would open up a situation where these third party's claims now would have to be considered by treating doctors because of the potential effect of those claims. Or the potential effect of their treatment, in this case, Depakote. And that would adversely affect or impair or distract the treating doctor from giving the medication that that patient needs, in this case, Megan, and in this case, the Depakote. Mr. Conley, let's suppose that Julia brought her claim independently of her mother and mother was not even named in the lawsuit. Um, then it would be incumbent upon your client to raise as an affirmative defense the issue of waiver, right? Well, it would, but we would also argue that she can't do it under Doe versus McKay. Well, but if she alleged that the entire issue related to her spina bifida was the lack of warning about the effects of the Depakote, you think she still couldn't bring that independently of her mother? Uh, she cannot. Under Renslow. I apologize. She cannot. It's essentially a restituted kind of issue. It's already been determined that there was no negligence to the mother. Your question assumes that there is a theoretical possibility that the warnings were inadequate, but that has been legally determined. That in 2018, when that case got a legal determination that it was not viable, that's it. It's over. Well, in 2018, what was the basis for the dismissal? Was it a judgment on the pleadings? Was it summary judgment? Was it a 6-1-5? Was it a 6-1-9? It was a pleadings motion, but it was a pleadings motion, as I understand it, related to a 6-2-22 affidavit, meaning you're required to have a doctor say that there's some merit to the case. And so essentially, the court ruled on the fact that there is no merit as a matter of law. The plaintiff was given plenty of opportunity to find somebody that would substantiate that there's merit to the claim. There was no affidavit presented. The court made a ruling on the pleadings, and we're all with that decision now. We've got to work forward from that decision. But that decision says there is no viable claim of Megan's for medical negligence. And therefore, under Renslow, Kirk, and Doe, there's nothing to transfer. And you think that once that decision was made on September 10th, that the plaintiff said the obligation to file the appeal at that time as opposed to waiting until this decision? If they wanted to keep it alive, if they wanted to keep the issue alive, I'm not saying that they should have appealed it. I'm in no way critiquing that decision. But so long as that cause of action was alive in the legal process, it was theoretically viable. It is no longer theoretically viable. If I can address briefly the waiver issue, the case law that we cited is pretty clear. In particular, to address Justice Bowie's earlier question, the People v. Phyllis case that we cited, Supreme Court of Illinois, does comment on the fact that there is a distinction between mental illness and the specific decisional capacity to exercise and waive legal rights. That's what we're dealing with here. The mother came in. There was a line for a guardian on the waiver itself. The mother did not sign. There was no guardian appointed under the statute. The doctor, Dr. Strobel, did not send a letter or any information to my clients telling them that he was concerned or felt that there was impairment. And therefore, under the law, we had every right to presume legal competency. And so, you know, she's 25. She comes in. We have no notice. And she acknowledges that she's aware of the risk. She testified so in her own deposition. And she signed the waiver and the release. And we think the case law is pretty favorable to us in terms of that release and its enforceability. What about the fact that this woman didn't even know where she was? Well, I think that that's, with all due respect, I think that's an extreme exaggeration. So she has some, that's plaintiff's argument. Because on one occasion, she's not sure where she, she just traveled. You know, she's coming from Indiana, Dr. Strobel's in Indiana. She just traveled to our facility. And she's not entirely clear. But aside from that, and back to the people versus Phyllis decision and others, the, you know, a person doesn't have to be crystal clear about everything or the exact date in order to be deemed legally competent to make legal decisions for herself. And in this case, the release, you know, there's nothing complex about it. It's not a 40 page contract. It's pretty straightforward. And the items that were indicated, such as unprotected sexual activity, you know, she testified in her own deposition, which by the way, her treating doctor's deposition was taken before her deposition. And that treating doctor was asked, is she competent to testify at a deposition? And the parties did that before we even took her deposition. And that determined the answer was yes. We took her deposition and she gave deposition testimony consistent with our position that she was competent enough to understand what she was signing when she signed it. If we assume that she was competent to understand what she was signing, then according to this waiver, she was actually waiving the effects of unprotected sex, which would be from, from your client's point of view, a pregnancy, right? Correct. And all the quote resultant consequences. Well, but she's not waiving negligence, is she? I mean, isn't there a question of fact as to whether she can waive negligent behavior? Well, she's, she's, this, I don't know how this is different than, than a release. If somebody goes horseback riding or something else where they say, look, someone can come up with a theory if I get hurt that someone was negligent in how they led the group of people on horses. But if a person, and we cited the racetrack case, if a person signs a release saying, look, I know things can happen on the, on the horse trail. I understand horses are animals. I'm going to sign a release. Those can be and should be upheld as long as people understand what they're waiving. There's a certain risk to them. And the risks adjacent with pregnancy, it's well covered in the record that she was fully informed as to those risks by Dr. Strobel and on. And so I do think she- And, and she, she had a failed pregnancy before. So she knew what sex was like. But my question to you is she can't waive, can she, the failure of a doctor,  or Dr. Strobel to adequately inform her of the risks of this DEPA code? Or at least is there a question of fact as to whether she can waive that? There's, there's no question of fact as to whether or not she can waive that. She is what the, the DEPA code is, is, it's like anything else in life that, that we do. There's elements of risk with everything. The key here is that from our affirmative defense standpoint, she's saying that whatever else I'm on, whatever else I'm doing, I will waive. If I have unprotected sex, I will waive a claim related to the foreseeable or the resulting consequences of that. And so there are two different things. She's waiving, she's saying, if it relates to sex and pregnancy, then I'm waiving any claim about that. If the doctor did something else to her, you know, that might be different if it was outside the context of the release. But this activity is within the context of the release. And so she has waived the resulting consequences of unprotected sexual activity. She can do that. She can parse out what she's waiving. My question is really whether it's foreseeable. You can waive things that are foreseeable, but the question of fact that I'm asking is, can you waive the negligence of a physician in failing to warn? Well, I don't think waivers waive someone's negligence. I think they waive the right to bring a claim based on certain activity. And so, you know, in this case, this isn't saying if the doctor's negligent in doing something to me,  What if the doctor is negligent and what it says is, I know there are all these things going on in my life, one of which is I'm on medication. So I will agree not to engage in unprotected sexual activity, okay? That's the next step after the prescription. And there's a reason for that. There's a reason that that's in there. And we know it from the record and the testimony that she knows why that's in there. It relates to the DEPA code. So to suggest that there's something else there about lack of warning, she's saying that anything related to unprotected sexual activity, I understand, I get it. The foreseeable consequences to her are foreseeable justice because the record's clear that she's been fully informed that pregnancy is a resulting consequence and that she's been informed that there could be harm to the baby. Okay, well, let me stop you for one second. I mean, we've got to go back to the fact that the DEPA code PDR entry states in part, valproate can cause major congenital malformations, particularly neural tube defects, e.g. spinal bifida. And prescribers should inform pregnant women and women of childbearing potential that use of DEPA code during pregnancy increases the risk of birth defects and adverse effects on neurobehavioral development. Dr. Strobel knew that when he prescribed the drug, Dr. Strobel actively concealed, basically admitted that I don't want to tell her this because she might say, I don't want the drug. How do you get around the fact that he admitted that he would not give that warning that the label on the drug clearly states should be given because he wasn't sure that the patient would take the drug he wanted her to take. I understand that there's medical reasons he wanted her to take it because it was the best drug for her condition and that the drug in fact helped her in her condition. However, he didn't warn her of that. So the waiver that she signed and the sexual activity that she was warned about against, she didn't have in her head that these consequences could be the result of not following through with the waiver restrictions. So how can she weigh that? And isn't that negligent on the doctor's part for not informing her specifically of what that drug's consequences would be? Thank you, Justice. Two things. First of all, I don't represent Dr. Strobel. His attorney will be commenting following me. But the second part is if I can cite to the record C-3363 page 25 and 26, she was warned. She admitted in her deposition she did know that she was warned about sex. The record at 3363- Warned about sex, how? I mean, what is she? She's warned about not having sex while she's in that facility for what? I mean, what are the consequences that she does? I'll skip forward to the consequences at C-3364 page 30 and aware that there would be birth defects as a potential consequence in the record C-3367 at page 41. Megan testified that she was aware of all of those things and she signed the release knowing all of those things. All right. Thank you. Thank you for pointing that out. Very well. Thank you. Good morning, your honors. This is Tim Sampson. I'm sorry. Hold on one second, Mr. Sampson. I'm sorry. I was trying to say something. I was on mute. Before we move on, Justice Cates, Justice Barbette, do you have any other questions for Mr. Connell? Not right now. Thank you. No, thank you. Okay. Then with all that being said, go on, Mr. Sampson. Thank you, your honor. And may it please the court. I represent Dr. Fasnacht and I would like to just put in context briefly how he fits into the picture. He comes into the picture in October of 2011. And previous to that, Dr. Gilbert, a psychiatrist, started treating Megan in 2007. And Dr. Strobel, who's a neurologist, started in 2006 and treated her for over five years. Both specialists had her on Depakote. And again, as my predecessor pointed out, Megan admitted in her deposition that she was aware that she should not get pregnant because there is a risk of spina bifida. Dr. Fasnacht deferred to the two specialists at North Restorative and kept her on the prescription. He was also aware that a sudden change to Megan's seizure medication could be dangerous. And I'm not suggesting that Dr. Gilbert and Dr. Strobel did anything wrong or were mistaken. I'm just putting into perspective how it was that as a primary care physician, Dr. Fasnacht didn't determine that he should change the prescription. Dr. Fasnacht's colleague, Rhonda Melvin, did repeat the warning not to get pregnant while Megan was at North Restorative. And there's testimony in the record to that effect. Again, Megan testified she knew she was under orders not to get pregnant while on Depakote. She knew the risk spina bifida. As was indicated earlier, Megan's claims were dismissed, including the claims against Dr. Fasnacht. And at the end of the case, when there was a final judgment, Megan had the ability in the notice of appeal to indicate she was appealing specifically that dismissal. And she did not. And as we know from the rules, you need to indicate in your notice of appeal, specifically what orders you are appealing. And that was not listed. So there's been no appeal of the dismissal of Megan's claims against Dr. Fasnacht. It's also important to point out that when it comes to the question of any duty on the part of Dr. Fasnacht toward Megan, that he did not treat her for prenatally. He did not engage in any forensic analysis of the pregnancy. And the circuit court found that the allegations against him sounded in wrongful birth. And again, because he did not engage in prenatal care or genetic analysis, he cannot be held liable for any wrongful birth. And again, as was pointed out by my predecessor, prescribing Depakote in and of itself was not a wrongful act. That's different than Renslow, where the transfusion of the wrong kind of blood was wrongful at the moment it happened. Here, we cannot say that the prescription of Depakote at the moment that it happened was wrongful. In fact, it was helpful as was pointed out earlier. Also, Megan was not pregnant at the time that Dr. Fasnacht deferred to the specialists regarding the prescription of Depakote. And as I pointed out earlier, his colleague Rhonda Melvin did repeat the warning. Mr. Sansone, when you say she repeated the warning, according to what I've read at least, nobody repeated any kind of warning that came close to what was in the black box. Okay, Your Honor, I'm sorry. I was taking the fact that she testified that she was aware of the risk as an indication that the warnings were given. I am aware there is some testimony in the record that indicates otherwise, but I'm relying on her own admission and her deposition to that. Right, but there's testimony. The whole issue on summary judgment is whether there's a question of fact that precludes the granting of summary judgment. And you all have pointed out one line where she says she's aware of the risks, but we've got testimony from your client as well as Dr. Strobel that says they didn't inform her. So somebody may have told her about the risks of birth defects, but the question I have in my mind is did they tell her about a neural tube defect or a spina bifida? I mean, we've got testimony both ways here. What did your client say he told her? It was pointed out. I'm sorry, Your Honor. Go ahead. It was pointed out earlier by plaintiff's counsel that Dr. Fasnacht did not indicate to Megan anything about that. That is correct. I take it as a judicial admission by Megan in her deposition that she was aware that she should not get pregnant. I think that's a judicial admission. I don't think she can rely on other testimony in the record to say that what she admitted to is incorrect. Well, saying that there are a lot of women who would say they shouldn't get pregnant and have nothing to do with neural tube defects. So saying that you shouldn't get pregnant to me is kind of a generic, I shouldn't get pregnant for a lot of reasons. But how does your client get the benefit of this waiver? I'm curious about that. I'm sorry. Your Honor, that's a very good point. And in the motion for summary judgment, Dr. Fasnacht specifically said that he was not joining in that part of his colleague's argument on summary judgment. Also at the oral argument in the transcript, you'll see that Dr. Fasnacht specifically indicated through his counsel that he was not relying on the waiver and supported his argument. And the circuit court's decision did not in any way indicate that Dr. Fasnacht benefited from the waiver. So as to the waiver, Dr. Fasnacht does not rely on it and specifically indicated that in his pleadings and at the oral argument. There is one other argument that Dr. Fasnacht makes and that is that even if there were hypothetically a duty that transferred to Julia, continuing Megan on the Depakote furnished a condition to make the injury possible but her subsequent active engagement in unprotected sex was the intervening illegal cause of the injury. And in Justice's case, I understand what you said earlier and your concern there. So I understand. That's an affirmative defense, right? The absence of causation. I don't believe the absence of causation must be pled as an affirmative defense, but my understanding of the responsive pleading that Dr. Fasnacht filed included enough to plead it as an affirmative defense if in fact it must be. So if my question to you is the same as to Mr. Conley, if Julia had brought this claim independently without her mother ever being named as a source and talked about the failure to warn on the Depakote, the same issues basically would be litigated and you would be filing an intervening act the negligence of the mother as an affirmative defense. Yes, Your Honor, that is true. Right. Okay. So based on the arguments that Dr. Fasnacht makes in his brief, what he argued at the oral argument before the circuit court and in the pleadings before the circuit court, Dr. Fasnacht respectfully asked that the court affirm the judgment and unfortunately that would end the case for Megan and Julia if that is what the law would require. That's our position under Renslow. I appreciate the court's time unless there are any other questions for me. Thank you, Mr. Hanson. Justice Cage, Justice Barberis? No, thank you. Okay. Thank you, Mr. Montgomery. Thank you, Your Honors. My name is Jerry Montgomery and I represent Dr. Strobel and his group, Josephson, Wallach, Munshire Urology. And the only issue on this appeal regarding Dr. Strobel and his group is whether personal jurisdiction rests over Dr. Strobel or his group. And in my brief time here, I will just set forth a number of facts, which I believe established there is no personal jurisdiction in Illinois. Josephson, Wallach, Munshire Urology has no offices in Illinois, no Illinois telephone number, does not advertise their services in Illinois and has no business connections or affiliations with the state of Illinois whatsoever. Their corporate office is in Indiana. Dr. Strobel was not licensed to practice medicine in Illinois and all of the care he provided to Megan Farmer was in the state of Indiana at his office in Indianapolis. Now, we produced two affidavits from the group and Dr. Strobel asserting these facts, which were never refuted. At all times, when Dr. Strobel was providing care to Megan Farmer, she was a resident of the state of Indiana. Dr. Strobel had never heard of no restorative in Carbondale until Jamie Carlson, Megan's mother, told him about it. He never referred anyone there, never contacted anyone there, nor does he have any affiliations with the facility whatsoever. Even after she became a patient there, he never spoke to anyone at no restorative or directed any correspondence to the facility. His last visit with Megan was in May of 2011, five months before she moved to Illinois and became a resident of no restorative. He didn't prescribe her any medications at no restorative and he didn't receive any of her records of her care while she was there. He didn't see her again until April 24, 2012, when she'd already left no restorative and moved back to the state of Indiana. Now, what plaintiff is really attempting to allege is that all the care provided by Dr. Strobel followed Megan to Illinois or the portable theory of liability. That theory has been soundly rejected by courts in Illinois. The seminal case rejecting the portable tort theory is Wright v. Yackley out of the Ninth Circuit. And if we look at the facts in Wright, they're almost similar to the facts here, except the case for personal jurisdiction is even stronger here. We don't even have a situation where Dr. Strobel called into Illinois and phoned in a prescription to the state. He had no contact with the state whatsoever. Did Dr. Strobel create a treatment plan for this young woman, Megan? Your Honor, his whole involvement was the prescribing of Depakote in the state of Indiana. He had no contact with anyone at no restorative or participated in the care provided there in any way. No, did he create a treatment plan for her because Dr. Fosnot said he just followed Dr. Strobel's plan? Your Honor, I believe what Dr. Fosnot was saying was that he just followed Dr. Strobel who had placed her on Depakote. She was originally placed on Depakote by Dr. Gilbert and that Dr. Fosnot continued him on the Depakote. I believe that's what Dr. Fosnot was referring to. I'm not aware of any plan where he said at no restorative, this is how she's to be treated. So he did nothing to touch no restorative by sending treatment plan, medical records, anything like that? No, Your Honor, he has had no contact with the facility whatsoever. And I believe Dr. Fosnot has even agreed with that. And to follow up on that, he wrote a letter or a couple of letters to help her get in to the facility. I'm assuming that's a requirement. Your Honor, the letters were written to the Indiana Medicaid pre-authorization unit. Okay. Megan Farmer's mother came back to him indicating to Dr. Strobel her intent to place Megan at no restorative. It is a prerequisite to have an out-of-state facility paid for by Indiana Medicaid that those letters be written. That was the sole purpose for which they were written. And they were mailed even then in the state of Indiana, Your Honor. So that was just to get payment, not to have any type of treatment issue. Your Honor, it was solely to have it authorized for payment. And I'm going to go ahead and jump to the next question. What is the status, I think in your brief, there is a pending action in the state of Indiana? Correct, Your Honor. When it was raised before the court that there was no personal jurisdiction, Plaintiff's counsel filed an action against Dr. Strobel and his group in Indiana. He was filed by a law firm in Indiana, but the same attorneys that are representing the plaintiff in this case have applied for pro bono privileges to prosecute that case in Indiana. As far as I knew, it was still pending, Your Honor. I have not gotten any of this, but they have filed suit against Dr. Strobel and his group in the state of Indiana. Okay, thank you. Go right ahead and finish up. Based on that, Your Honors, I would ask the court affirm the dismissal of Dr. Strobel and his group based on the lack of personal jurisdiction in the state of Illinois. Thank you, Mr. Montgomery. Justice Cates, before we move on, Justice Barberis, do you have any questions? No, thank you. No, thanks. Okay. Mr. Coito, you're on mute, so you'd unmute yourself and we'll have your rebuttal. Courtney, can you check his mute? I can ask him to unmute, but he'll have to... No, I believe I'm... Can you hear me now? Yes, sir. Like a Verizon commercial? Well, thank you. There's quite a bit to respond to, frankly. First, I do believe that the first counsel was in error about the record about... Look, at the time this case was dismissed, Megan Farmer, on count seven, count eight, count nine, had claims pending. So much of the pleading early on that I believe counsel was referring to... And by the way, count seven, eight, and nine were dismissed by the trial court on summary judgment, those Megan's claims. Had to do with the issue of wrongful life and wrongful birth. And those claims are the ones that were more or less dropped, but not... Because I always get confused. I can't remember Illinois allows wrongful life or wrongful birth, but those things have no relevance to this appeal or the claims after they were done. So Megan did have claims pending. And again, I don't mean to keep repeating myself, but she does not have to be a party. The defendants are arguing that she's an indispensable party to this litigation. And that's just not what the law is. With respect, I do wanna come back too to some of the questions and the answers. I believe from Justice Cates' questions about whether or not you can really waive a malpractice claim or negligence. The phrase here is just that she shouldn't engage in unprotected sexual activity. Whether or not that really encompasses the risk and the nature of this claim, which is that she's taking a prescribed medication. This is not an over-the-counter medication. People don't know about the dangers of this risk. You have to read the PDR or be trained in neurology or medical science. So the notion that she's waiving the failure to warn about what's been commonly referred to as the third most teratogenic drug in the whole PDR. I mean, that's simply not, at least it creates a question of fact, whether or not that could be encompassed within the waiver that she did sign. In respect to, we actually thought quite a bit about whether she was competent to be deposed, frankly. And there's a lot of things that we might take issue with in her deposition. This is a woman who's cognitively impaired, which is why she was going there. At one point, I really think that the counsel overstated even what her testimony was about what she knew and didn't know. She also, we cite this in our brief somewhere, that if she were warned about defects, she would have remembered that, OK? Dr. Gilbert, who is not a party to this case, was a therapist or something that initially prescribed Tepico at some point had testified that Megan probably wouldn't understand the warnings. I don't know how that actually cuts, but they can argue as a question of fact that even in the warnings that can be given, perhaps she wouldn't have understood them. They wouldn't have been effective. Again, those are questions of fact. That precludes summary judgment. And as far as this being a counsel's attempt to distinction, and by the way, Dr. Fasnacht, again, I'm jumping ahead, just jumping through this because I'm trying to respond. Dr. Fasnacht's notion that he wasn't party to the waiver, he wasn't. But nevertheless, the court's order doesn't distinguish between that. It doesn't tease out an analysis of Dr. Fasnacht's conduct. It dismisses everything. Dismissed him too. But the prescription of Depakote, whether done by Dr. Strobel or Dr. Fasnacht, and he signed multiple scripts, Dr. Fasnacht did for this drug. But the prescription of Depakote without warning about the black box, the warnings that's contained in the black box was wrongful at the time it was prescribed. And then last, I really want to hit on Doe because Doe is not, counsel relied on Doe quite a bit. It just doesn't apply here. And Doe, there was a third-party negligence claim from a father against his daughter's therapist and a claim where no claim was brought by the daughter. And the court cited, we do not believe that a similarly compelling circumstance are present in this case and thus we declined to apply Renslow's concept of transfer for negligence here. Again, Supreme Court, relationship between a mother and fetus is perhaps singular and unique. You didn't have that with an adult father and an adult daughter. It's demonstrably different from the relationship that exists between a parent and adult child. And then notably the injury complained of in Renslow was physical, traceable to the negligent treatment of the mother. That's what we have here, that they didn't have that in Roe where there was a psychological, or I'm sorry, Doe, not Roe, Doe, D-O-E. And that's exactly what we, we basically have the same fact pattern as Renslow here. That an entirely foreseeable injury occurred based upon the conduct of the defendants. Neuro restorative, the nurses, they're not, by the way, the nurses can't, the nurses can't give the drug warning. I mean, if you do sue the manufacturer, you still get into the learned treatise doctrine where the doctor has to testify. That's not on the nurses, but the nurses did not point out to the prescribing physicians what it looked to be an interest in men. You know, and then, and both of these, well, I shouldn't say both, excuse me. Dr. Fasnacht testified that he would have wanted to known that had it occurred. And there are numerous other factual questions regarding the waiver. You know, I mean, it's more like here, there's a case cited about a health club. Somebody signed a health club waiver, a waiver at a health club and a mirror fell. And the court said that was a question of fact, whether that type of harm was encompassed by a waiver. Because when you sign up for the health club, maybe, you know, you can get injured lifting weights, but you don't really expect something to fall off the wall. And there are numerous other things. Megan was easily victimized. She's easily led. And whether they maintain, whether there's questions of fact about how they maintained this relationship with who ends up being the father of the child, the Santos. And again, I'm relying on the brief for the notion that Dr. Strobel signed two medical letters of necessity to get her there. But for that, she would not have gone. And that her care and treatment followed them there. Even though I don't believe there was a written plan, Justice Cates, the court's question there. Nevertheless, that followed her even without a writing because that was his testimony. And Dr. Fasnacht said he was going to do that. Even though Dr. Fasnacht, the record is clear that he adjusted her medication in other respects. He took her, he adjusted her Ativan. This is in the briefs. And what she also signed when she went into neurorestorative that she gave neurorestorative the power to adjust their medications as they saw fit. In light of this, just that there's numerous questions of fact, Julia Farmer and Megan, the trial courts, respectfully, the trial court's decision was in error and the case should be reinstated. Thank you. I have one question, Justice Booth. Go ahead. And I know that we've discussed this probably at length, but can you point out anywhere that the exact, that any doctor warned of the exact black box label warnings to Megan or anyone else before prescribing it or during its use? Frankly, Justice Barbaros, I know that Dr. Fasnacht and Strobel did not. There was a testimony, I believe from Dr. Gilbert, but I don't recall what, I believe her name was Gilbert. She was a therapist early on. I don't recall, honestly, what that is. So I'm not aware of anything. Although again, Dr. Gilbert noted her numerous cognitive problems and wondered whether she would even understand the warning. That just creates a question of fact at most, whether that's, I'm sorry, beyond that, I don't know, I'm not unable to answer the question beyond that, Justice Barbaros. Okay, thank you. So before we let these gentlemen go, Justice Cage or Justice Barbaros, do you have any questions? No, thank you. No, thank you. All right, well, gentlemen, thank you so much for your arguments today. We will obviously take this matter under advisement and we will issue an order in due course. We will hope you all have a great day.